**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CLAIRE BALL and SCOTT SCHLUTER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **15 C 10441** |
| **v.** ) | |
| ) | **Judge John Z. Lee** |
| **LISA M. MADIGAN, Attorney General** ) | |
| **of Illinois, CHARLES W. SCHOLZ,** ) | |
| **Chairman, Illinois Board of Elections,** ) | |
| **ERNEST L. GOWEN, Vice Chairman,** ) | |
| **Illinois Board of Elections, and** ) | |
| **BETTY J. COFFRIN, CASANDRA B.** ) | |
| **WATSON, WILLIAM J. CADIGAN,** ) | |
| **ANDREW K. CARRUTHERS, WILLIAM** ) | |
| **M. McGUFFAGE, and JOHN R. KEITH,** ) | |
| **members of the Illinois Board of** ) | |
| **Elections, in their official capacities,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

In 2013, the Illinois General Assembly enacted a statute banning medical cannabis cultivation centers and dispensaries from making campaign contributions to any political committee established to promote a candidate for public office. The statute likewise bans candidates and political committees from receiving such contributions. 10 Ill. Comp. Stat. 5/9-45 (hereinafter, "§ 9-45").

Plaintiffs are Libertarian Party candidates who ran for political office in Illinois's 2016 election cycle and plan to run in future elections. They challenge the contribution ban in § 9-45 as an unconstitutional restriction of First Amendment rights. For the reasons provided below, the Court finds that § 9-45 is invalid under the First Amendment and grants summary judgment in Plaintiffs' favor.

## Background

The legalization of medical cannabis is a controversial subject. While the use of cannabis remains illegal under federal law, *see* 21 U.S.C. § 812, many states have recently approved legislation removing state-level criminal penalties for the use, cultivation, and dispensation of cannabis for medical purposes. *See* 410 Ill. Comp. Stat. 130/5(e) (listing states).[1] On August 1, 2013, Illinois became the nineteenth state to enact such legislation. That day, the Illinois General Assembly passed the Compassionate Use of Medical Cannabis Pilot Program Act, 410 Ill. Comp. Stat. 130/1 *et seq.* (hereinafter, "Medical Cannabis Act" or "Act"). The Act took effect on January 1, 2014. Its purpose is "to protect patients with debilitating medical conditions, as well as their physicians and providers, from arrest and prosecution, criminal and other penalties, and property forfeiture if the patients engage in the medical use of cannabis." *Id.* § 5(g). Although the Act was originally scheduled for repeal on January 1, 2018, recent legislation extended its sunset date to July 1, 2020.

In addition to setting forth eligibility requirements for patients' use of medical cannabis, the Act regulates the operation of medical cannabis cultivation centers and dispensaries. Cultivation centers and dispensaries must be respectively registered with Illinois's Department of Agriculture and Department of Financial and Professional Regulation. *Id.* § 10(f), (o). These agencies may approve registration permits for a maximum of twenty-two cultivation centers and sixty

---

[1] Some states have eliminated criminal sanctions for recreational use as well. *See, e.g.*, Colo. Const. art. XVIII, § 16; Wash. Rev. Code § 69.50.101 *et seq.* (2015); Mass. Gen. Laws ch. 94C, § 32L (2008).

dispensaries. *Id.* §§ 85, 115. To qualify for a registration permit, a cultivation center or dispensary must obtain agency approval under a points-based evaluation system that accounts for numerous selection criteria. 8 Ill. Admin. Code 1000.110 (criteria for cultivation centers); 68 Ill. Admin. Code 1290.70 (criteria for dispensaries). Registration permits expire annually, and once a permit expires, a registrant must apply for renewal of its permit in order to continue operations. 410 Ill. Comp. Stat. 130/85(b), -/125.

On the same day that it enacted the Medical Cannabis Act, the Illinois General Assembly amended the Illinois Election Code, 10 Ill. Comp. Stat. 5/9-1 *et seq.*, by inserting § 9-45, a new statutory provision that governs political campaign contributions from medical cannabis organizations. Under § 9-45, "[i]t is unlawful for any medical cannabis cultivation center or medical cannabis dispensary organization or any political action committee created by any medical cannabis cultivation center or dispensary organization to make a campaign contribution to any political committee established to promote the candidacy of a candidate or public official." *Id.* § 9-45. It is also "unlawful for any candidate, political committee, or other person to knowingly accept or receive any contribution" made by a medical cannabis cultivation center or dispensary organization. *Id.* A person or entity who violates § 9-45 may be fined up to $10,000. *Id.* § 9-23. Like the Medical Cannabis Act, § 9-45 took effect on January 1, 2014. Unlike the Medical Cannabis Act, § 9-45 is not scheduled for repeal.

3

Plaintiffs Claire Ball and Scott Schluter are Illinois residents and members of the Libertarian Party. In the 2016 election cycle, Ball ran as the Libertarian Party candidate for Illinois Comptroller, and Schluter ran as a Libertarian Party candidate for Illinois State Representative for the 117th District. Ball and Schluter have attested that they are active in Illinois politics and plan to run for office again in the future. They support the expanded legalization of cannabis, and they wish to legally solicit and accept campaign contributions from medical cannabis cultivation centers and dispensaries.

In November 2015, Plaintiffs filed this lawsuit against the Illinois Attorney General and members of the Illinois Board of Elections. Plaintiffs contend that § 9-45 is unconstitutional both on its face and as applied, on the ground that it violates their and others' rights to freedom of speech and freedom of association protected under the First Amendment. They seek declaratory and injunctive relief. Now before the Court are Plaintiffs' and Defendants' cross-motions for summary judgment.

## Analysis

The Court must grant a motion for summary judgment when the evidence, viewed in the light most favorable to the nonmoving party, shows there are no material disputes of fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). In marshalling evidence at the summary judgment stage, parties generally may not rely upon their pleadings. *Jones v. City of Elkhart*, 737 F.3d 1107, 1112 (7th Cir.

2013).  But where, as here, the plaintiffs have filed a verified complaint, the complaint "is the equivalent of an affidavit for summary judgment purposes." *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013).

## I.  Subject-Matter Jurisdiction

Plaintiffs have challenged Illinois's ban on campaign contributions from medical cannabis cultivation centers and dispensaries as unconstitutional under the First Amendment.  As a threshold matter, the Court observes that Plaintiffs have Article III standing to bring this pre-enforcement First Amendment challenge.[2] Plaintiffs have suffered an injury because, while they wish to freely associate with medical cannabis organizations by soliciting and accepting contributions from them, they have refrained from doing so to avoid violating § 9-45.  They have further suffered an injury to the extent that such organizations wish to contribute to their campaigns but, likewise wary of § 9-45, have not done so.  These injuries—which are fairly traceable to § 9-45 and redressable by a ruling of this Court—suffice to confer standing.  *See Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 146–48 (7th Cir. 2011).

In addition, Plaintiffs have *jus tertii* standing to vindicate the political-speech rights of their contributors and supporters.  *Id.* at 148 (political committee had standing to vindicate First Amendment rights of potential contributors); *Majors v. Abell*, 317 F.3d 719, 722 (7th Cir. 2003) (candidate for public office had standing to

---

[2]     Federal courts have "an independent duty to ensure subject-matter jurisdiction" over the cases brought before them.  *Dexia Crédit Local v. Rogan*, 602 F.3d 879, 883 (7th Cir. 2010).  The Court must therefore consider Article III issues such as standing and mootness even though the parties have not raised them in their briefs.

vindicate First Amendment rights of his supporters); *see also Craig v. Boren*, 429 U.S. 190, 194–96 (1976). The Court also notes that this case presents a live controversy, because Plaintiffs wish to solicit and accept contributions "on a continuing basis in future elections." *Wis. Right to Life*, 664 F.3d at 149. Having considered these threshold matters, the Court finds that it has jurisdiction to adjudicate this controversy and turns to the merits of Plaintiffs' First Amendment claim.

## II. Constitutionality of Illinois's Contribution Ban

"There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. F.E.C.*, 134 S. Ct. 1434, 1440–41 (2014) (Roberts, C.J.) (plurality opinion). The First Amendment safeguards this right by "afford[ing] the broadest protection" to political expression and association. *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). And the Supreme Court has made clear that "[s]pending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." *F.E.C. v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001); *accord Citizens United v. F.E.C.*, 558 U.S. 310, 342, 349–56 (2010).

Since its decision in *Buckley v. Valeo*, however, the Supreme Court has distinguished restrictions on independent expenditures for political speech (*i.e.*, expenditures made independently of a candidate's campaign) from restrictions on campaign contributions, reasoning that the former place a relatively heavier burden on First Amendments rights. 424 U.S. at 19–21; *see Wis. Right to Life*, 664 F.3d at 152. Restrictions on independent expenditures are thus subject to strict scrutiny,

meaning that they may withstand constitutional challenge only if the government demonstrates that they promote a "compelling interest" and are the "least restrictive means to further the articulated interest." *McCutcheon*, 134 S. Ct. at 1444; *Citizens United*, 558 U.S. at 340; *Buckley*, 424 U.S. at 16. By contrast, restrictions on campaign contributions are subject to a form of intermediate scrutiny, which the Supreme Court has described as a "lesser but 'still rigorous standard of review.'" *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 29). Under this intermediate standard, a restriction on contributions may be upheld only if the government demonstrates that the restriction promotes a "sufficiently important interest" and is "closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* (quoting *Buckley*, 424 U.S. at 25); *accord Randall v. Sorrell*, 548 U.S. 230, 247 (2006).[3]

Although § 9-45 restricts only campaign contributions, Plaintiffs contend that it should nevertheless be reviewed using strict scrutiny rather than *Buckley*'s intermediate standard. The basis for their argument is that, by targeting medical cannabis cultivation centers and dispensaries, § 9-45 "favor[s] some speakers over others," "reflects a content preference," and therefore "demand[s] strict scrutiny."

---

[3]    Courts have not settled on a uniform term for the standard of review governing restrictions on campaign contributions under *Buckley*. For example, the standard has alternately been described as "rigorous review," *McCutcheon*, 134 S. Ct. at 1446, "limited scrutiny," *Randall*, 548 U.S. at 267 (Kennedy, J., concurring), "relatively complaisant review," *F.E.C. v. Beaumont*, 539 U.S. 146, 161 (2003), and "the 'closely drawn' standard," *Wagner v. F.E.C.*, 793 F.3d 1, 32 (D.C. Cir. 2015). The Court will follow the Seventh Circuit's example and refer to this standard simply as the "intermediate standard." *See Wis. Right to Life,* 664 F.3d at 152, 155.

Pls.' Mem. Supp. Mot. Summ. J. at 5, ECF No. 29-1 (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015)) (internal quotation marks omitted).

The Supreme Court has so far rejected invitations to apply strict scrutiny to contribution restrictions post-*Buckley*. *See McCutcheon*, 134 S. Ct. at 1445–46; *Beaumont*, 539 U.S. at 161–62. What is more, courts have applied *Buckley*'s intermediate standard to contribution restrictions even when the restrictions have targeted specific classes of speakers, such as corporations and unions, *F.E.C. v. Nat'l Right to Work Comm.*, 459 U.S. 197, 208–10 (1982), government contractors, *Wagner*, 793 F.3d at 21–23, and lobbyists, *Preston v. Leake*, 660 F.3d 726, 737–38 (4th Cir. 2011).

Plaintiffs, however, do have a point. "'[S]peech restrictions based on the identity of the speaker are all too often simply a means to control content.'" *Reed*, 135 S. Ct. at 2230 (quoting *Citizens United*, 558 U.S. at 340). Furthermore, the Supreme Court has "insisted that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" *Id.* (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994)). By singling out medical cannabis organizations, § 9-45 appears to reflect precisely such a content or viewpoint preference. Although *Buckley* and its progeny permit the government to regulate campaign contributions to some extent, surely the First Amendment does not give the government free rein to selectively impose contribution restrictions in a manner that discriminates based on content or viewpoint. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 388–95 (1992).

That said, whether the First Amendment requires courts to use strict scrutiny when reviewing content- or viewpoint-based restrictions that target political contributions from a specific category of speakers is a question to be left for another day. For the reasons provided below, § 9-45 fails to pass constitutional muster even under *Buckley*'s less rigorous intermediate standard. The Court therefore need not decide whether the statute would survive the more demanding standard of strict scrutiny, if that standard were to apply.

### A. Whether the Contribution Ban Promotes a "Sufficiently Important Interest"

Defendants bear the burden of proving the constitutionality of § 9-45. *McCutcheon*, 134 S. Ct. at 1452 (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000)). To meet this burden under *Buckley*'s intermediate standard, Defendants must first demonstrate that the contribution ban in § 9-45 promotes a sufficiently important government interest. *Id.*; *Buckley*, 424 U.S. at 25.

The Supreme Court has recognized only one government interest that is sufficiently important to justify restrictions on campaign contributions: the interest in preventing *quid pro quo* corruption or its appearance. *McCutcheon*, 134 S. Ct. at 1450; *accord Wis. Right to Life*, 664 F.3d at 153. In promoting this interest, the government "may permissibly limit 'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates." *McCutcheon*, 134 S. Ct. at 1450 (quoting *Buckley*, 424 U.S. at 27). But it may not limit contributions

merely because they enable individuals to gain "'influence over or access to' elected officials or political parties." *Id.* at 1451 (quoting *Citizens United*, 558 U.S. at 359).

Here, Defendants assert that § 9-45 promotes Illinois's sufficiently important interest in preventing *quid pro quo* corruption, or the appearance of such corruption, by restricting political contributions from members of the medical cannabis industry. Defs.' Mem. Supp. Mot. Summ. J. at 6, ECF No. 33-1. They claim that the risk of corruption in this industry is significant because medical cannabis cultivation centers and dispensaries compete for a limited number of annually issued registration permits. In other words, Defendants argue, members of Illinois's medical cannabis industry have strong incentives to make campaign contributions in hopes of garnering *quid pro quo* political favors in the form of renewed permits. *Id.* at 11–12. Defendants also highlight the fact that the use of medical cannabis was legalized only recently, arguing that it is particularly important to avoid the distortive effects of corruption or the appearance of corruption in a new, untested regulatory scheme directed at a previously illegal substance. *See id.* at 11.

In support of this claim, Defendants do not point to any legislative findings raising concerns about corruption or the appearance of corruption in the medical cannabis industry. Nor do they point to any instances of actual corruption involving any medical cannabis cultivation center or dispensary. Rather, they rely solely upon Illinois's general history of political corruption scandals, in addition to five news reports post-dating § 9-45's enactment that raise concerns over whether

corruption will play a role in the medical cannabis pilot program. *Id.* at 4–5, 11–12.[4] For their part, Plaintiffs contend that Illinois's history of corruption and the news reports Defendants have cited are insufficient evidence of Defendants' asserted government interest. Pls.' Mem. Supp. at 7–10; Pls.' Mem. Opp. Defs.' Mot. at 3–6, ECF No. 34.[5]

"[M]ere conjecture" about the risk of corruption or its appearance is insufficient to show that a contribution restriction promotes a sufficiently important government interest. *McCutcheon*, 134 S. Ct. at 1452; *Nixon*, 528 U.S. at 392. But in general, courts have deferred to legislative determinations that contribution restrictions are a necessary prophylactic measure in combatting potential corruption. *See Nixon*, 528 U.S. at 391 n.5 (collecting cases). In addition, the

---

[4] For the five news reports Defendants have cited, *see* Editorial Board, *Lift the Smokescreen on Pot Licenses*, Chi. Trib. (Jan. 15, 2015); Kari Lydersen, *Pot Biz Lights Up*, Ill. Times (Nov. 20, 2014), http://illinoistimes.com/article-14717-pot-biz-lights-up.html; Rhyan Zuercher, *Smoke and Mirrors*, WTTW Chi. Tonight (Nov. 17, 2014), http://chicagotonight.wttw.com/2014/11/17/smoke-and-mirrors; Mary Ann Ahern, *Rauner Objects to Illinois Medical Marijuana Bill*, NBC 5 Chi. (Sept. 16, 2014), http://www.nbcchicago.com/blogs/ward-room/rauner-objects-to-illinois-medical-marijuana-bill-275386251.html; Hilary Gowins, *State, Insiders Stand to Benefit from Illinois' Medical Marijuana Law*, Huffington Post (June 20, 2014), http://www.huffingtonpost.com/hilary-gowins/state-insiders-stand-to-b_b_5515604.html; *see also* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 17–26, ECF No. 33-3.

[5] Plaintiffs also argue that the news reports are inadmissible hearsay. Pls.' Mem. Opp. at 3. The Court rejects this argument. The news reports are being used as evidence of the state of mind of the reports' authors and sources, as well as evidence of the reports' likely effects on listeners and readers, in order to prove the appearance of corruption. They are not offered to prove the truth of the statements they contain, and they therefore are not hearsay. Fed. R. Evid. 801(c); *Mariani v. United States*, 80 F. Supp. 2d 352, 362 (M.D. Pa. 1999) ("Objections to findings of fact that cite newspaper and magazine articles . . . have been overruled to the extent that the articles have not been offered for the truth of the matter asserted, but instead to demonstrate the appearance of corruption created by soft money contributions."); *cf. Nixon*, 528 U.S. at 393 (noting that "newspaper accounts of large contributions support[ed] inferences of impropriety" in First Amendment challenge to Missouri contribution limits).

Supreme Court has instructed that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Id.* at 391. Under this standard, "[t]he dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." *Id.* (citing *Buckley*, 424 U.S. at 27 & n.28).

The evidence Defendants have offered in support of their asserted government interest leaves much to be desired. But under the relevant precedents, the Court cannot say that their evidence is insufficient. It is quite plausible that the risk of corruption would have been salient to the legislators who enacted § 9-45, given Illinois's well-chronicled history of *quid pro quo* political corruption. Moreover, the cited news reports support Defendants' claim that the medical cannabis pilot program has created public concern about the potential for corruption. The reports themselves are arguably speculative in nature, to the extent that they raise suspicions about corruption in the absence of evidence that corrupt exchanges have actually occurred. But they nevertheless substantiate Defendants' claim that the media and the public have perceived a risk of corruption relating to the medical cannabis pilot program. This is all the more true given that cannabis distribution and use were legally banned in Illinois until the passage of the Medical Cannabis Act. Although thin, such evidence is sufficient under governing law to establish an important government interest for purpose of this analysis. *See Nixon*, 528 U.S. at 393–94 (finding sufficient evidence at the

12

summary judgment stage of the government's interest in preventing corruption or its appearance where defendants cited only newspaper reports and a single affidavit from a state senator).

For these reasons, the Court concludes that Defendants have adequately demonstrated that § 9-45 promotes a sufficiently important government interest to justify a restriction on campaign contributions. But this showing is not enough on its own to satisfy Defendants' burden of proving the constitutionality of § 9-45. Rather, they must further demonstrate that § 9-45 is "closely drawn" to this important government interest. For the reasons that follow, they fall short of doing so.

### B.    Whether the Contribution Ban Is "Closely Drawn"

A contribution restriction may withstand constitutional challenge only if it is "'closely drawn to avoid unnecessary abridgment of associational freedoms.'" *McCutcheon*, 134 S. Ct. at 1456 (quoting *Buckley*, 424 U.S. at 25). In determining whether a restriction is closely drawn, courts assess the means–end fit between the restriction and the asserted government interest. *Id.* at 1445–46. The restriction need not be the least restrictive means available of promoting the interest, but it must be reasonably proportional to the interest while avoiding needless infringement of First Amendment rights. *Id.* at 1456–57 (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)); *Randall*, 548 U.S. at 249.

Several features of § 9-45 render it plainly disproportional to the government's interest in preventing *quid pro quo* corruption or its appearance. First, § 9-45 is a disproportionate measure in that it imposes an outright ban on

contributions, rather than a mere dollar limit on contribution amounts. Wholesale bans on contributions are generally less likely than dollar limits to be appropriately tailored to government interests. *See Beaumont*, 539 U.S. at 162 (noting that whether a contribution restriction takes the form of a ban rather than a limit is relevant to whether the restriction is "closely drawn"). In *McCutcheon v. F.E.C.*, for example, the Supreme Court considered the constitutionality of a contribution restriction that amounted to "an outright ban on further contributions to [ ] other candidate[s]" once a donor reached the aggregate limits set forth under federal law. 134 S. Ct. at 1448, 1456–58. Describing the ban as "sweeping" and "indiscriminate," the Court invalidated it in part because the government had failed to explain why a ban, rather than some more moderate measure, was a proportionate means of furthering the government's asserted interest. *Id.* at 1458.

As in *McCutcheon*, Defendants in this case have failed to explain why a flat prohibition is proportionate to the government's interest in avoiding the risk of actual or perceived corruption that arises when donors from the medical cannabis industry make monetary contributions to political campaigns. They assert that a wholesale ban is appropriate on the ground that medical cannabis cultivation centers and dispensaries "reap profits from the industry and require State licensure to operate" and therefore "pose the greatest risk of corruption." Defs.' Mem. Supp. at 13. But this bald assertion is little more than conjecture; Defendants offer no support for their claim that medical cannabis cultivation centers and dispensaries in fact pose a greater risk of corruption than other potential donors, including those

14

subject to similar regulation and licensure requirements. Such conjecture has "never [been] accepted . . . as adequate to carry a First Amendment burden." *McCutcheon*, 134 S. Ct. at 1452 (quoting *Nixon*, 528 U.S. at 377); *see also Green Party of Conn. v. Garfield*, 616 F.3d 189, 207 (2d Cir. 2010) (invalidating ban on contributions from lobbyists where "recent corruption scandals had nothing to do with lobbyists" and where the government failed to explain why dollar limits on contributions from lobbyists would have been insufficient to prevent corruption or its appearance).

In addition, it bears noting that, without § 9-45, contributions from medical cannabis cultivation centers and dispensaries would still be subject to generally applicable contribution limits that the Illinois General Assembly approved in 2009. *See* 10 Ill. Comp. Stat. 5/9-8.5. Under these limits, a candidate political committee may not accept contributions over $5,000 from any individual or over $10,000 from any corporation, labor organization, or association, with adjustments for inflation. *Id.* The selection of these base limits "indicates [the legislature's] belief that contributions of [these] amounts or less do not create a cognizable risk of corruption." *McCutcheon*, 134 S. Ct. at 1452. Defendants have not explained why these broadly applicable contribution limits are insufficient to prevent the risk of corruption in the medical cannabis industry, much less why an outright ban on contributions from industry members is appropriate. The Court does not mean to say that no additional measures on top of these baseline prophylactic limits could ever be permissible. But the heavy-handed "'prophylaxis-upon-prophylaxis'"

approach that Illinois has taken by layering § 9-45 on top of the baseline limits requires the Court to be "particularly diligent in scrutinizing the law's fit." *Id.* at 1458 (quoting *F.E.C. v. Wis. Right to Life*, 551 U.S. 449, 479 (2007)).

Moreover, § 9-45 is a poorly tailored means of promoting the government's interest in preventing *quid pro quo* corruption or its appearance because Defendants have offered no legitimate basis for singling out medical cannabis cultivation centers and dispensaries from other potential donors who also "reap profits" and "require State licensure to operate." Defs.' Mem. Supp. at 13. It is well recognized that the risk of *quid pro quo* corruption is heightened where private actors stand to benefit financially from favorable government action. Acknowledging this reality, courts have upheld contribution restrictions applying to government contractors, lobbyists, and others doing business with the government. *See Wagner*, 793 F.3d at 21–23 (upholding federal ban on contributions from government contractors in light of courts' general deference to restrictions on government employees' speech); *Preston*, 660 F.3d at 737–38 (upholding state ban on contributions from lobbyists, in part because lobbyists "are especially susceptible to political corruption"); *Ognibene v. Parkes*, 671 F.3d 174, 186–93 (2d Cir. 2011) (upholding municipal limits on contributions from those doing business with the government). But § 9-45 is wholly distinguishable from the restrictions that those courts have upheld. Rather than restricting contributions from some broad category of entities that require state licensure or otherwise stand to gain financially from certain state action, § 9-45 inexplicably targets a highly limited

16

subset of those entities: medical cannabis cultivation centers and dispensaries.[6] The industry-specific focus of the statute's scope belies Defendants' contention that § 9-45 is appropriately tailored to prevent the general risk of corruption involving regulated entities subject to licensure requirements.

Pointing to language in *Buckley*, Defendants argue that "the legislature need not 'strike at all evils at the same time,'" and that "'a statute is not invalid under the Constitution because it might have gone farther than it did.'" Defs.' Mem. Supp. at 8 (quoting *Buckley*, 424 U.S. at 105). These principles may be true as a general matter, and at least one court has relied upon them in upholding a contribution ban. *See Ognibene*, 671 F.3d at 191 (rejecting underinclusiveness challenge to limits on contributions from entities doing business with the government). But they do not save § 9-45, whose scope is so conspicuously and unusually narrow as to call into serious doubt whether § 9-45 advances Defendants' asserted government interest. *See Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (invalidating Florida law banning certain speech by mass media but not by other speakers, on the ground that the law's underinclusiveness "raised serious doubts" as to the state's "commitment to advancing [its asserted] interest" in protecting privacy).

---

[6] For two of the many examples of Illinois licensure requirements apart from those in the Medical Cannabis Act, *see* 230 Ill. Comp. Stat. 10/1 *et seq.* (imposing licensure requirements on riverboat gambling operations and limiting the number of licenses available), and 235 Ill. Comp. Stat. 5/5-1 *et seq.* (imposing licensure requirements and other regulations on manufacturers, distributors, and retailers of liquor). Apart from the generally applicable limitations set forth under 10 Ill. Comp. Stat. 9/8.5, discussed *supra*, Illinois law does not limit political contributions made by these regulated entities.

In nevertheless arguing that § 9-45 is appropriately tailored, Defendants cite *Casino Association of Louisiana v. Foster*, 820 So.2d 494 (La. 2002), and *Soto v. New Jersey*, 565 A.2d 1088 (N.J. Super. Ct. 1989). In those cases, courts upheld state contribution bans that applied only to casinos, casino employees, or other gaming interests, finding that the bans were appropriately tailored to the government's interest in preventing corruption or its appearance. *Casino Ass'n*, 820 So.2d at 495–97; *Soto*, 565 A.2d at 1092. But both cases are distinguishable from the facts at hand. In *Casino Association*, the defendants supported the challenged ban with evidence that nine states, including the state that had enacted the ban at issue, had recently prosecuted government officials in corruption cases involving gaming interests. 820 So.2d at 508. Likewise, in *Soto*, the defendants supported the challenged ban with specific legislative findings by an investigative committee regarding the need to combat the appearance of corruption arising from contributions made by casino employees. 565 A.2d at 1096–97. By contrast, Defendants in this case have offered no evidence of actual corruption, in Illinois or elsewhere, involving the medical cannabis industry. And although they point to five news reports as evidence of an appearance of corruption, these reports provide no reason to suspect that the appearance of corruption is a problem unique to the medical cannabis industry, rather than a problem afflicting highly regulated industries in general, so as to justify the targeted approach taken in § 9-45. As such, Defendants have not met their burden of demonstrating that § 9-45 is properly tailored to the government's interest in preventing *quid pro quo* corruption

or its appearance, and Defendants' reliance upon *Casino Association* and *Soto* is unpersuasive. *Cf. DePaul v. Commonwealth*, 969 A.2d 536, 544–45, 552–53 (Pa. 2009) (invalidating a state contribution ban and likewise distinguishing *Casino Association* and *Soto*).

Defendants also rely upon *Schiller Park Colonial Inn, Inc. v. Berz*, in which the Illinois Supreme Court upheld a contribution ban that applied only to liquor licensees.[7] 349 N.E.2d 61, 64–65, 69 (Ill. 1976). In *Schiller*, the defendants asserted that the ban promoted the government's interests in (1) "regulating alcoholic beverages," (2) "preventing liquor licensees from gaining influence over legislators or other political figures," and (3) "protecting liquor licensees from being pressured into making political contributions." *Id.* at 65. But the *Schiller* defendants' assertion of these interests is at odds with the United States Supreme Court's more recent holdings that a contribution restriction may withstand a First Amendment challenge only if it promotes the government's interest in preventing *quid pro quo* corruption or its appearance. *McCutcheon*, 134 S. Ct. at 1450; *Citizens United*, 558 U.S. at 359. Accordingly, the Court does not find *Schiller* persuasive.

In sum, the Court concludes that Defendants have failed to meet their burden of showing that § 9-45 is closely drawn to the government's interest in preventing *quid pro quo* corruption or its appearance. Defendants have offered no justification for imposing an outright ban on contributions from medical cannabis cultivation centers and dispensaries when more moderate measures, such as dollar limits on

---

[7]     The contribution ban at issue in *Schiller* was subsequently repealed by Illinois Public Act 80-1198, § 1.

19

contributions, are available. Nor have they explained why the risk of corruption or the appearance of corruption might be uniquely problematic in the medical cannabis industry, such that it could be justifiable for the government to target contribution restrictions at the medical cannabis industry alone. As such, the Court concludes that § 9-45 places a significant and unjustifiable burden on the rights to freedom of speech and freedom of association. Section 9-45 is therefore invalid under the First Amendment.

## III.    Whether the Illinois Attorney General Is a Proper Defendant

One final matter remains to be addressed. As noted above, Plaintiffs have brought this suit against the Illinois Attorney General and members of the Illinois Board of Elections. The parties do not dispute that the members of the Illinois Board of Elections are properly named as Defendants in this action, given that the Board of Elections has the authority to impose civil penalties on anyone in violation of § 9-45. *See* 10 Ill. Comp. Stat. 5/9-23.

The parties do dispute, however, whether the Illinois Attorney General is a properly named party. Defendants argue that she is not, on the ground that no Illinois statute explicitly tasks the Attorney General with enforcement of § 9-45. The Court is unpersuaded by this argument. Section 9-23 of the Illinois Election Code provides that civil penalties imposed by the Board of Elections shall be enforceable in state court, and that the Board may report violations of § 9-45 and noncompliance with the Board's orders to the Attorney General. *Id.* In addition, Illinois law provides the Attorney General with broad authority "[t]o institute and prosecute all actions and proceedings in favor of or for the use of the State, which

may be necessary in the execution of the duties of any State officer." 15 Ill. Comp. Stat. 205/4; *accord People ex rel. Alvarez v. Gaughan*, -- N.E.3d --, 2016 WL 7007749, at *9 (Ill. Dec. 1, 2016) (citing *Lyons v. Ryan*, 780 N.E.2d 1098, 1104 (Ill. 2002)) ("[T]he Attorney General is the chief law enforcement officer of the state and, as such, is afforded a broad range of discretion in the performance of public duties, including the discretion to institute proceedings in any case of purely public interest."). Taken alongside § 9-23, this broad grant of authority appears to include the power to institute proceedings to enforce civil penalties imposed by the Board of Elections for violations of § 9-45.

That said, the parties have not cited—and the Court has not found—any case law squarely addressing this issue. It may be that Illinois courts, upon confronting the question, might find a basis for limiting the Attorney General's authority so as to exclude any power to enforce § 9-45. But Illinois courts have never before limited this power, and it is hardly apparent from the relevant statutory authorities that the Illinois Attorney General is unable to enforce § 9-45, or at least to enforce orders by the Board of Elections relating to violations of § 9-45. As such, the Court finds that the Illinois Attorney General is properly named as a Defendant in this case.

## <u>Conclusion</u>

For the reasons stated herein, Plaintiffs' motion for summary judgment [29] is granted and Defendants' motion for summary judgment [33] is denied. The Court will enter judgment for Plaintiffs declaring § 9-45 unconstitutional and enjoining Defendants from its enforcement. The parties are directed to confer and submit a proposed judgment to the Court within seven days.

**IT IS SO ORDERED.**                    **ENTERED**    **3/24/17**

_____
**John Z. Lee**
**United States District Judge**